**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WESLEY ALIKO, Derivatively on Behalf of HUT 8 CORP.,<br><br>Plaintiff,<br><br>v.<br><br>BILL TAI, MIKE HO, ASHER GENOOT, ALEXIA HEFTI, JOSEPH FLINN, MAYO A. SHATTUCK, III, STANLEY O'NEAL, AMY WILKINSON, RICK RICKERTSEN, JAMIE LEVERTON, and SHENIF VISRAM,<br><br>Defendants,<br><br>and,<br><br>HUT 8 CORP.,<br><br>Nominal Defendant. | Case No: 1:24-cv-20890-DSL<br><br>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT [REDACTED]**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Wesley Aliko ("Aliko"), Matthew Medney ("Medney"), and Alexander Jiang ("Jiang," and collectively, "Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Hut 8 Corp. ("Hut 8" or the "Company"), submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of internal books and records produced to Plaintiffs, as well as publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

2. Hut 8 is a crypto currency and data mining company. The Company is engaged in Bitcoin mining and hosting, managed services, energy arbitrage, and operating traditional data centers. The Company operates computing infrastructure which mines Bitcoin and delivers computing services to enterprise customers.

3. Hut 8 was formed following the November 2023 merger of Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") (the "Merger"). USBTC held a 50% interest in a joint venture bitcoin mining facility, located in King Mountain, Texas (the "King Mountain JV"), which was acquired in the Merger.

4. In connection with the Merger, despite touting the energy potential the Merger would provide Hut 8, the Individual Defendants principally failed to disclose the energy issues with the King Mountain JV – one of USBTC's digital asset mining sites. The Individual Defendants also failed to disclose that the risks associated with the loss of internet connectivity had already materialized at the King Mountain JV, rendering their disclosure of that risk inadequate and misleading.

5. On January 18, 2024, at approximately 10:30 AM EST, J Capital Research published a report that alleged, *inter alia*, that that Legacy Hut's merger with USBTC was premised on a number of misstatements, including that USBTC's King Mountain JV "has historically failed to provide energy and high-speed internet."

6. On this news, the Company's stock price fell $2.16, or 23.3%, to close at $7.12 per share on January 18, 2024, on unusually heavy trading volume.

7. As a result of the wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## JURISDICTION

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims raise a federal question under Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78u-4(f)) and under Section 11(f) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77k(f)(1)). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have

9. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this Court because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the

Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**Plaintiffs**

11. ***Plaintiff Wesley Aliko*** is, and was at all relevant times, a shareholder of the Company. Plaintiff Aliko will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

12. ***Plaintiff Matthew Medney*** is, and was at all relevant times, a shareholder of the Company. Plaintiff Medney will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation

13. ***Plaintiff Alexander Jiang*** is, and was at all relevant times, a shareholder of the Company. Plaintiff Jiang will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

*14.* ***Nominal Defendant Hut 8*** is incorporated under the laws of Delaware, with its principal executive offices located in Miami, Florida.

**Director Defendants**

15. ***Defendant Bill Tai*** ("Tai") serves as Chairman of the Board of Directors (the "Board") and has served as a member of the Board at all relevant times. Prior to the Merger, Defendant Tai was a director at Legacy Hut beginning in March 2018 through the Merger. Defendant Tai serves as a member of the Board's Nominating, Environmental, Social and Governance Committee.

16. ***Defendant Mike Ho*** ("Ho") has served as a member of the Board and as the Company's Chief Strategy Officer ("CSO") at all relevant times. Prior to joining Hut 8, Defendant Ho co-founded and served as Chief Executive Officer ("CEO") and chair of the board of USBTC.

17. ***Defendant Asher Genoot*** ("Genoot") has served as the Company's President and as a member of the Board at all relevant times. On February 6, 2024, the Company appointed Genoot as CEO. Defendant Genoot is a co-founder of USBTC and, from 2020 to 2023, served as USBTC's President and as a director.

18. ***Defendant Joseph Flinn*** ("Flinn") has served as a member of the Board at all relevant times. Prior to the Merger, Defendant Flinn was a director at Legacy Hut beginning in August 2018 through the Merger. Defendant Flinn serves as Chair of the Board's Audit Committee.

19. ***Defendant Mayo A. Shattuck, III*** ("Shattuck") has served as a member of the Board at all relevant times. Prior to joining Hut 8, Shattuck served in a leadership role with USBTC for "Web 3.0." He also was a director of USBTC between December 2021 through the Merger. Defendant Shattuck serves as Chair of the Board's Compensation and Talent Development Committee.

20. ***Defendant Stanley O'Neal*** ("O'Neal") has served as a member of the Board at all relevant times. Prior to joining Hut 8, O'Neal served as a director of USBTC from March 2021 through the Merger. Defendant O'Neal serves as a member of the Board's Audit Committee.

21. ***Defendant Amy Wilkinson*** ("Wilkinson") has served as a member of the Board at all relevant times. Prior to joining Hut 8, Wilkinson served as a director of USBTC from August 2022 through the Merger. Defendant Wilkinson serves as Chair of the Board's Nominating,

Environmental, Social and Governance Committee and as a member of the Compensation and Talent Development Committee.

22. ***Defendant Rick Rickertsen*** ("Rickertsen") has served as a member of the Board at all relevant times. Prior to the Merger, Defendant Rickertsen was a director at Legacy Hut beginning in December 2021 through the Merger. Defendant Rickertsen serves as a member of the Board's Compensation and Talent Development Committee.

23. ***Defendant Alexia Hefti*** ("Hefti") served as a member of the Board at all relevant times through until the 2024 Annual General Meeting held on June 21, 2024. Prior to the Merger, Defendant Hefti was a director at Legacy Hut beginning in May 2021 through the Merger. Defendant also served as a member of the Board's Nominating, Environmental, Social and Governance Committee.

24. Defendants Tai, Ho, Genoot, Flinn, Shattuck, O'Neal, Wilkinson, Rickertsen, and Hefti are herein referred to as the "Director Defendants".

**Officer Defendants**

25. ***Defendant Jamie Leverton*** ("Leverton") served as CEO of the Company until February 6, 2024, when the Company notified her of her termination, without cause. Defendant Leverton served as a member of the Board until her departure effective February 12, 2024. Defendant Leverton was the CEO at Legacy Hut. Defendant Leverton sold 134,485 shares of Company common stock on inside information, for which she received approximately $1.8 million in total proceeds.

26. ***Defendant Shenif Visram*** ("Visram") has served as the Company's Chief Financial Officer ("CFO") at all relevant times through to August 2024. Defendant Visram was the CFO of

Legacy Hut prior to the Merger. Defendant Visram sold 17,897 shares of Company common stock on inside information, for which he received approximately $253,067 in total proceeds.

27. Defendants Leverton and Visram are sometimes referred to herein collectively as the "Officer Defendants".

28. The Director Defendants and the Officer Defendants are sometimes referred to herein collectively as the "Individual Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background of the Bitcoin Industry

29. Bitcoin is a decentralized, peer-to-peer virtual currency that exists solely in electronic form and is the most utilized digital asset in the retail and commercial marketplace. Bitcoin is used like money and can be exchanged for traditional currencies or used to purchase goods and services, typically online.

30. Crypto assets, such as Bitcoin, are held within public blockchain addresses, which are alphanumeric references where assets can be sent or stored. Each public address is controlled through a corresponding private key and public key that are cryptographically generated. The private key allows the recipient to access any funds belonging to the address and the public key validates the transactions that are broadcasted to and from the address.

31. The Bitcoin blockchain is a decentralized, peer-to-peer network of data made up of a chain of "blocks" that contain information about each Bitcoin transaction. Blocks are strung together in chronological order, creating a digital chain of blocks, and once a block is added to the blockchain, anyone can view it. However, before a block is added to the Bitcoin blockchain, it first must be verified through a process called mining.

32. Mining is the process by which specialized computer equipment solves complex math problems to verify and secure transactions and create new blocks in the Bitcoin blockchain. Mining hardware provides computing power, which is measured in "hashrate" or "hashes per second." A "hash" is a single computation run by a miner to attempt to create a new block in the Bitcoin blockchain. The more hashes per second a miner provides, the greater probability of the miner creating a new block. Successfully adding a block to the blockchain results in a reward of Bitcoin.

33. Most Bitcoin mining is conducted by mining pools, which coordinate groups of miners that work together to have a better chance of being rewarded Bitcoin. Mining pools share the payouts among participants.

34. The process of mining requires significant computing power, and therefore, vast amounts of electricity.

**Legacy Hut and USBTC**

35. Founded in 2017, Legacy Hut was a Canada-based company that went public in 2018. At the time of the Merger, Legacy Hut had two digital asset mining sites in Alberta, Canada, five high performance computing data centers in British Columbia and Ontario, Canada, and one authorized repair center in Alberta, Canada, that was certified by MicroBT, a Bitcoin mining machine manufacturer.

36. Legacy Hut was the first Canadian digital asset miner to list on NASDAQ and it had one of the highest inventories of self-mined Bitcoin of any publicly traded company.

37. Prior to the Merger, [redacted]

[redacted]

38. USBTC was a privately held Nevada corporation with a principal place of business in Miami, Florida. USBTC was an industrial-scale operator of Bitcoin mining sites, and its strategy was to design, build, and operate sites with access to low-cost and sustainable sources of electricity. As of September 30, 2023, USBTC operated a total of approximately 182,000 miners (including 30,200 owned miners) across four locations, with access to roughly 730 megawatts ("MW") of electricity, via USBTC's mining, hosting, equipment sales, and managed infrastructure operations.

39. At the time of the Merger, USBTC had four digital asset mining sites. It fully owned a site in Niagara Falls, New York, referred to as the "Alpha Site," that had access to approximately 50 MW of electricity. Pursuant to a joint venture agreement, it held a held a 50% interest in a site in King Mountain Texas, the King Mountain JV also referred to as the "Echo Site," that had access to approximately 280 MW of electricity. USBTC also managed, under property management agreements, sites in Kearney, Nebraska and Granbury, Texas, referred to, respectively, as the "Charlie Site" and the "Delta Site." The Kearney and Granbury sites had access to approximately 100 MW and 300 MW of electricity, respectively.

40. USBTC acquired its 50% interest in the King Mountain JV through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North Member LLC ("Compute North"). It acquired Compute North's 50% interest in TZRC LLC ("TZRC"), an early-stage operator of vertically integrated cryptocurrency mining and power facilities and assumed a property management agreement with TZRC and a senior secured promissory note related to the King Mountain JV. NextEra Energy, Inc. held the other 50% interest in TZRC.

41. USBTC's revenue streams included self-mining, hosting third-party machines at its sites for a fee, managed infrastructure, and equipment sales.

42. The only cryptocurrency that USBTC has mined is Bitcoin. UBSTC's goal was to increase the hashrate it operated and to deploy, host, and operate miners with profitable hashrate-to-power cost profiles.

43. Hosting services include the provision of mining equipment, energized spaces, and typically also monitoring, active troubleshooting, and various maintenance levels for the mining equipment.

44. Managed infrastructure services include providing day-to-day management, support, and administrative functions of operating Bitcoin mining datacenters owned or leased by third-party or related party customers, in exchange for management fees and reimbursement of certain operating costs.

**<u>The Merger</u>**

45. In December 2022, Stifel GMP ("Stifel") prepared a presentation to the Director Defendants. At this time, Stifel [redacted]

46. At this same time, [redacted] Thus, a business combination was vital

for Legacy Hut to [redacted]

47. [redacted]

[redacted]

48. On February 7, 2023, Legacy Hut and USBTC announced in a press release that their boards had unanimously approved a business combination agreement (the "Business

Combination Agreement"), pursuant to which the companies would combine in an all-stock merger of equals and become wholly owned subsidiaries of Hut 8.

49. Under the Business Combination Agreement, Legacy Hut shareholders would receive 0.2 shares of Hut 8 stock for each Legacy Hut share and USBTC shareholders would receive 0.6716 shares of Hut 8 stock for each share of USBTC capital stock, resulting in Legacy Hut and USBTC shareholders each effectively owning approximately fifty percent of Hut 8 stock.

50. Legacy Hut agreed to provide USBTC with secured bridge financing in the amount of $6-6.5 million in the interim period.

51. Following the Merger, the board of directors of Hut 8 would consist of 5 directors from Legacy Hut and 5 directors from USBTC, including Bill Tai (Legacy Hut) as the Chair of Hut 8's Board.

52. The senior management team would also include former management of Legacy Hut and USBTC, including Jaime Leverton (Legacy Hut) as CEO, Asher Genoot (USBTC) as President, Michael Ho (USBTC) as CSO, and Shenif Visram (Legacy Hut) as CFO.

53. On February 13, 2023, Hut 8 filed the initial registration statement on Form S-4 with the SEC announcing the proposed merger between Legacy Hut and USBTC. Genoot and Ho signed the Form S-4.

54. Defendants Ho, Tai, O'Neal, Shattuck, Wilkinson, Leverton, Rickertsen, Hefti, and Flinn submitted their written consent to being named in the registration statement as prospective directors of post-Merger Hut 8, that are attached as exhibits to the registration statement.

55. Hut 8 filed seven amendments to the registration statement on Forms S-4/A on or around April 18, 2023, June 13, 2023, July 17, 2023, August 24, 2023, September 18, 2023, November 6, 2023, and November 8, 2023. Genoot and Ho signed each amendment to the initial

registration statement. Each of the amendments also incorporated the previously filed exhibits consisting of the written consents of Ho, Tai, O'Neal, Shattuck, Wilkinson, Leverton, Rickertsen, Hefti, and Flinn to be named as directors of post-Merger Hut 8.

56. The SEC declared the registration statement, as amended, effective on November 9, 2023. On that same day, the Company filed a final prospectus on Form 424(b)(3) (the "Prospectus"), that incorporates the registration statement. The Prospectus and the registration statement, as amended, are collectively referred to as the "Registration Statement."

57. On November 29, 2023, the Company filed three registration statements on Form S-8 (the "Forms S-8"), which registered shares related to employee benefit plans pursuant to and subject to the terms of the Business Combination Agreement. Genoot, and Ho signed each of the Forms S-8 and each of the Forms S-8 incorporated the Prospectus by reference.

58. On November 30, 2023, the Merger between Legacy Hut and USBTC closed.

**The False and Misleading Registration Statement**

59. As detailed further below, the Individual Defendants drummed up investor support for the proposed Merger–including in a February 7, 2023 investor presentation–by claiming that USBTC would improve the Company's "energy strategy and commitment to leveraging low-cost renewable energy sources," including with "[a] diversified mix of hydro, wind, and nuclear energy sources powering the expanded site portfolio." In a press release announcing the Merger, the King Mountain JV was touted as in an important asset and that the "USBTC team will bring significant leadership in energy orientation, development, demand response, hedging, grid character attacks."

60. The Individual Defendants caused Hut 8 to issue the misleading Registration Statement, while failing to disclose the energy and internet deficiencies at the King Mountain JV

prior to the Merger. The Registration Statement contained only generic risk statements about USBTC's energy supply and that it may face internet disruptions. Yet, the reality was far different.

61. Critically, the Registration Statement failed to disclose that King Mountain JV was *already* experiencing energy issues and internet outages. Yet, the Individual Defendants were aware of, or should have been aware of, the operational deficiencies of the King Mountain JV, as reflected by the Opinion and Order denying, in part, defendants motion to dismiss in the factually related securities class action, captioned *In re Hut 8 Corp. Sec. Litig.*, No. 1:24-cv-00904-VM (S.D.N.Y.) (the "Securities Class Action"). Pertinently, the Opinion and Order found that "the King Mountain JV experienced energy and internet problems that were knowable before the Merger." Securities Class Action, ECF No. 57, at 60.

62. The court in the Securities Class Action also found the risks included in the Registration Statement were "misleading because they omitted energy and internet problems that materialized." *Id*. at 65.

63. As explained below, however, these facts were concealed from investors until the publication of the J Capital Research Report on January 18, 2024.

**<u>The Individual Defendants Failed to Conduct Adequate Due Diligence</u>**

64. As explained herein, as officers and directors of the Company, the Individual Defendants owed Hut 8 certain fiduciary duties including those of loyalty, good faith, and due care. To satisfy their duty of care, the Individual Defendants were required to make a good faith effort to oversee the Company's operations by implementing an oversight system and then monitoring it.

65. However, the Individual Defendants breached their duty of care to Hut 8 by failing to exercise reasonable and prudent supervision over management, controls, and operations. Specifically, they failed to conduct adequate due diligence of USBTC.

66. Prior to the Merger, [redacted]

[redacted]

68. [redacted]

69. [redacted] Further bolstering this point is the Opinion and Order in the Securities Class Action, holding that the energy and internet problems at King Mountain JV were knowable prior to the Merger and the risk statements were false as they already materialized. Securities Class Action, ECF No. 57, at 57, 65.

70. Moreover, it is unclear if the Board challenged the accuracy of the representations being made to them, including in [redacted]

71. [redacted]

72. [redacted]

73. Given their positions and personal interests in the creation of the post-Merger Hut 8, a reasonable inference is that the Individual Defendants intentionally ignored or exercised bad faith in monitoring the risk associated with the Merger. The Individual Defendants allowed, and

participated in, the misrepresentation of the King Mountain JV's operations, as demonstrated from the Individual Defendants' insufficient due diligence of USBTC.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### Statements Regarding the Benefits of the Merger While Omitting Known Issues with King Mountain JV

74. A February 7, 2023 Hut 8 Presentation for investors titled "Strategic Merger of [Legacy Hut] and [USBTC]" with a subheading, "Creating a leading energy and infrastructure platform of the future," represented that USBTC was expected to strengthen the Company's "energy strategy and commitment to leveraging low-cost renewable energy sources," including with, *inter alia*, "[a] diversified mix of hydro, wind, and nuclear energy sources powering the expanded site portfolio."

75. An analyst and investor call held at 8:30 a.m. E.T. on that same date similarly emphasized the energy potential of the Merger, with Leverton stating: USBTC "brings outstanding energy-sourcing management and hedging capabilities to [the Company], significantly enhancing our ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets."

76. The Registration Statement also touted the renewable energy sources powering USBTC's sites, stating that, "[t]he Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sources from ERCOT . . . ."

77. The Registration Statement acknowledged certain power generation-related risks, including that disruptions of the energy grids on which USBTC relies could have adverse effects on USBTC's operations: "The operation of the grids USBTC relies on, including the . . . [Electrical

Reliability Counsel of Texas (ERCOT)] grid[] . . . subjects USBTC to a variety of risks, including the breakdown and failure of equipment . . . [and] outages affecting information technology systems."

78. However, the above statements in the Registration Statement[1] – which were made by Genoot and Ho, and are attributable to the Company and its senior executives, including the Individual Defendants, who were involved in Hut 8's day-to-day affairs and, upon information and belief, the due diligence leading up to the Merger – are materially misleading because they failed to disclose the energy issues that had already materialized at the King Mountain JV by the time the statements were made.

79. The positive statements about the Merger were also misleading because they failed to disclose known internet disruptions at the King Mountain JV. Although the Registration Statement[2] purported to warn of the risks of a loss of internet connectivity, it did not disclose that those risks had already materialized as the Registration Statement stated in part:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

---

[1] These statements are also incorporated by reference in the Forms S-8 insofar as the Forms S-8 incorporate by reference the Prospectus.

[2] The Forms S-8 incorporate the same misleading risk disclosure by reference insofar as they incorporate the Prospectus by reference.

80. CW 1[3] – who worked as a data analyst for the Company in the months leading up to the Merger and after the close of the Merger – had daily discussions with the Director of Infrastructure before the Merger about the ongoing energy issues with the King Mountain JV. Given CW 1's position at pre and post-Merger Hut 8, CW 1 had personal knowledge of the operations and deficiencies at the King Mountain JV.

81. According to CW 1, Genoot also complained about the efficiency of the King Mountain JV during general meetings.

82. CW 1's job responsibilities included analyzing mining data to attempt to maximize operational capacity of the miners, which involved tracking miner outages on a daily basis, and managing miner counts and total miner operations.

83. In that capacity, CW 1 saw evidence of the energy issues in the Hashrate failure and energy usage reports he received. According to CW 1, the King Mountain JV had the most inefficient miners, and this inefficiency impeded the ability to properly mine.

84. In addition, during CW 1's tenure with the Company, there were often dips in the network service with several outages and network failures.

85. The outages, which were reported in daily outage reports, were often significant and caused by broken miners or offline miners.

86. CW 1 stated that senior management in Operations directed data analysts to classify the outages in a manner that masked their true nature, such as characterizing the miners as

[3] All allegations and statements attributable to Confidential Witness 1 ("CW 1") are taken from the Securities Class Action and are based upon information and belief. In the Securities Class Action, the court held that the Consolidated Amended Complaint "describes CW 1 and pleads the CW 1's allegations with sufficient particularity for the Court to credit them at this stage of the litigation." Securities Class Action, ECF No. 57, at 61-62.

overheated and not offline, rather than an outage. Over half, or more, outages were falsely reclassified as overheated.

87. [redacted]

88. Accordingly, the above risk disclosure was materially misleading because the Individual Defendants failed to disclose that the risk of internet disruptions had already materialized by the time the statement was made and the Individual Defendants failed to disclose the energy issues at the King Mountain JV. As reliable internet connectivity is critical for bitcoin mining, a major component of both USBTC's and the Company's business. Indeed, Hut 8 derives the bulk of its revenue from self-mining. Thus, the energy and internet disruptions at one of the Company's bitcoin mining sites was crucial to operations.

**THE TRUTH EMERGES**

89. On January 18, 2024, J Capital Research published a report entitled *The Coming HUT Pump and Dump* with a subheading which read "management hiding stock ownership through undisclosed related party, a stock promotor cabal, and a host of left-for-dead assets" (the "Report"). The Report claimed that USBTC's CEO, Defendant Ho, may be hiding ownership shares through his partner, Anna Kudrjasova ("Kudrjasova"), via her company Anaya Capital Corp.:

> Documents for different companies list the same address for Ho and Kudrjasova, in Dubai at 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.
>
> "(31) Anna Kudrjasova has sole voting and dispositive power over the securities held for the account of this selling stockholder, as director. The selling stockholder's address is 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671."
>
> U.S. Gold Corp Prospectus
>
> "21 The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc. – 5709 Cayan Tower in Dubai – is different from the address he gave to the State of Florida in registering Prive."
>
> Takata v RIOT page 65[9]

90. The Report describes how "[t]his is particularly significant, because Ho has committed to a lock-up of 65% of his shares – but not hers. Anaya Capital appears to hold about 3.7 mln shares." The Report details that Ho and Kudrjasova have been associated for nearly a decade:

> The two have been associated for about a decade. Back in 2014, the Vancouver Sun identified Ho and Kudrjasova as a couple.
>
> *HO A GO-GO: Folks filled a 3,000-square-foot, Boundary-at-Kitchen showroom recently at a debut party for Shanghai-born Michael Ho's Vancouver Motorcars firm. Pushed outside were Ferraris, sporty Audis and Ho's Mercedes-Benz SLR 6.3 on which he must pay a hefty insurance premium. That's because, like Latvia-born personal and business partner Anna Kudrjasova, he is 20 years old but already a seasoned entrepreneur. The two sold their Ritzypin online womenswear firm recently when, despite satisfactory sales margins, local manufacturing was barely profitable.*
>
> [11]

91. The Report also stated that King Mountain JV "has historically failed to provide energy and high-speed internet," and described an extensive history of a lack of connectivity, despite the fact Bitcoin mining requires constant connectivity:

> ***The King Mountain JV has been plagued with connectivity problems***. In its 2023 Annual Report, published on March 16, 2023, MARA reported "the company experienced significant production downtime in the second and third quarters . . . and delays in energization at King Mountain." MARA had 60,000 miners at the facility, but according to a Proof of Claim MARA filed in the Compute North bankruptcy case, the miners were never energized. MARA's Statement of Claim said that King Mountain lacked a high-speed internet connection
>
> * * *
>
> On November 23, 2022, ***MARA, which was the largest customer for the King Mountain site, filed a motion stating that Compute North at King Mountain had failed to energize its miners and failed to provide an adequate internet connection***.
>
> * * *
>
> MARA also said that there was a ***lack of high-speed connection at the facility***.
>
> * * *
>
> ***USBTC itself was so disgruntled that it filed suit. Just one month before buying the King Mountain JV, USBTC filed an action against CN King Mountain LLC for failing to find a location where miners could be installed and energized***.
>
> * * *
>
> Our diligence suggests that the facility now uses a Starlink satellite network instead of a broad- band connection to access the internet. This is unheard of in the Bitcoin mining industry. Starlink is an expensive and unreliable choice for mining at scale. Said one interviewee who managed a large data center when asked if he would ever use Starlink as primary internet source for Bitcoin mining at scale, he said "never." [Emphasis added].

92. The Report also stated that the Company overstates profitability by failing to account for certain "interest expenses" concerning King Mountain JV:

The company is misleading on the profitability of the JV, with accounts showing $665,000 of profit while completely ignoring about the $3.2 mln interest expense incurred during the same period.

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

**An apparently, albeit barely, profitable JV seems like good news**

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

**Note 10. Notes Payable**

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

**Notes Payable – September 30, 2023:**

**Yet these JV numbers exclude the very expensive interest cost from a promissory note assumed with the acquisition of the JV - this cost is shown elsewhere in the company filings**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| *Anchorage Loan* | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| | | | | |
| *TZRC Secured Promissory Note* | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| | | | | |
| *Third Party Note* | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals | $ 141,832 | $ 985 |

* = Net of debt issuance costs which totaled approximately $3.7 million.

93. The Report also casted doubt on to other reported financials stating:

> We are confused about how many miners USBTC has. The November 2023 Hut 8 operations update claims that USBTC had 46,225 Bitcoin miners deployed for October 2023, and yet at the end of September 2023, USBTC reported operating only 30,200 miners.
>
> We find this ramp-up extremely unlikely, especially without disclosing new machine orders or deposits for new miners in USBTC's end September 2023 balance sheet. Remaining construction in progress was far less than the typical purchase value for that many extra machines. Is USBTC telling the truth?

94. The Report further claimed that, without the Merger with Hut 8, an individual "highly familiar" with USBTC stated the USBTC would have been forced to undergo a structured bankruptcy:

> One person highly familiar with USBTC told us, "without the merger, [USBTC] would have done a structured bankruptcy."
>
> * * *
>
> "The merger was a complete godsend for USBTC," someone deeply involved with the company told us. Without the merger, this person said, USBTC would have been bankrupt within weeks. "It was very much in the cards." ***In early 2023, USBTC gave up almost half its miners, plus $20.7 mln and some other assets, in an apparent default***.
>
> * * *
>
> Our interviewee said that USBTC "begged" NYDIG to forgive the loan but soon after Christ- mas was forced to surrender assets. ***Hut 8 managed to characterize this default as a $23.7 mln GAIN on debt extinguishment. But it had started out as a $24.2 mln LOSS that the company "fixed" through an accounting sleight of hand***. Abracadabra! [Emphasis added].

95. Finally, the Report concluded, based on a review of financial reports, "we estimate a value for USBTC that's as much as 70% less. Typically, such egregious over-payments occur only when management is being enriched." The Report continued:

> ‣ We are highly skeptical that the King Mountain JV is worth the $105 mln paid by USBTC, given reports that the center at the time lacked both reliable power and internet.

> Nevertheless, we assign what we believe to be an aggressive $105 mln valuation – the price USBTC paid for the facility. This is despite MARA's recent purchase of Granbury and Kearney, which indicates that the King Mountain JV would be worth only $64 mln.
>
> ‣ Our valuation of USBTC's Managed Infrastructure Operations (MIO) business is $51 mln, a generous 3x forward revenue.
>
> * * *
>
> ***In total, we value the USBTC operating assets at the high end at $219 mln. Not only do we suspect that USBTC overpaid for the King Mountain JV, but Hut 8 overpaid again, by a factor of four, for the same facility, along with the Niagara mining facility and the two managed-facility contracts***. New Hut issued 49.7 mln shares in exchange for all US- BTC stock – a value of about $495 mln at the time. Hut 8 also took on $160 mln in net debt plus around $90 mln in planned spending commitments ($40 mln for AI equipment and $50 mln in planned capital expenditure) in exchange for the USBTC and Legacy Hut assets. [Emphasis added].

96. On this news, Hut 8's stock price fell $2.16, or 23.3%, to close at $7.12 per share on January 18, 2024, on unusually heavy trading volume.

**THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE HUT 8'S <u>STOCK PRICE WAS ARTIFICALLY INFLATED</u>**

97. As a result of the above false and misleading statements, the Company's share price was artificially inflated. Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Hut 8 common stock.

98. Specifically, Defendant Leverton sold 98,724 shares of her personally-held stock on December 22, 2023 at an average share price of $14.21 for gross proceeds of $1,402,966. Then, on January 12, 2024, Defendant Leverton sold 35,761 shares of her personally-held stock at an average share price of $10.10, for gross proceeds of $361,257. In doing so, Defendant Leverton received approximately $1,764,223 in total gross proceeds.

99. Defendant Visram sold 17,897 shares of his personally-held stock on December 22, 2023 at an average share price of $14.14 for gross proceeds of $253,063.

100. Collectively, Defendants Leverton and Visram collectively sold more than 150,000 shares of their personally-held stock for collective gross proceeds in excess of $2 million, just before the truth emerged and the Company's share price declined by mover than 23%. Defendants Leverton and Visram were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of Hut 8's common stock resulting from their false and misleading statements and omissions before the truth was disclosed to the investing public.

## **DAMAGES TO THE COMPANY**

### **Securities Class Action**

101. On February 7, 2024, the Securities Class Action was commenced in the United States District Court for the Southern District of New York against the Company, Genoot, Ho, Leverton, and Visram. The operative Consolidated Amended Complaint (Securities Class Action, Dkt. No. 39), was filed on June 14, 2024.

102. The court in the Securities Class Action denied, in part, the motion to dismiss the Consolidated Amended Complaint – holding that the lead plaintiff pled claims pursuant to Sections 11 and 15 of the Securities Act.

103. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

104. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

105. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated.

106. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

107. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

108. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

109. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

**THE COMPANY'S MANDATE OF THE BOARD**

110. The Company's Mandate to the Board states in relevant part:

> **RESPONSIBILITIES AND DUTIES OF THE BOARD**
>
> The Board is responsible for the stewardship of the Company and providing oversight as to the management of the business and affairs of the Company. It is management's duty to run the Company's business on a day-to-day basis. The Board is expected to focus on guidance and strategic oversight, with the goal of increasing long-term shareholder value. In discharging their duties, directors must act honestly and in good faith, with a view to the best interests of the Company. Directors must exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.
>
> The responsibilities and duties of the Board shall include the following:
>
> ***Chief Executive Officer and Officers***
>
> - Appointing the Chief Executive Officer (the "**CEO**") and, together with the CEO, developing a written position description for the role of the CEO.
> - Delegate to the CEO and other senior executives the authority over the day-to-day management of the business and affairs of the Company.
> - Developing the corporate goals and objectives that the CEO is responsible for meeting and reviewing the performance of the CEO against such corporate goals and objectives.
> - Taking steps to satisfy itself as to the integrity of the CEO and other executive officers and that the CEO and other executive officers create a culture of integrity throughout the organization.
> - Succession planning for the CEO and other key personnel.
> - Approving the compensation of the CEO upon recommendation of the Compensation Committee.
>
> ***Financial Reporting***
>
> Approving: the annual financial statements and related Management's Discussion and Analysis, and their filing and disclosure; and the Company's annual earnings press releases, including any pro forma or non-GAAP information included therein, and their filing and disclosure.

- Reviewing and monitoring, with the assistance of the Audit Committee:

i. the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
ii. the external reporting of the Company's financial and operating performance in compliance with all regulatory and statutory requirements; and
iii. the independence, qualifications, appointment and performance of the Company's external auditor.

***Financial Reporting Processes, Accounting Policies and Internal Controls***

- Reviewing and monitoring, with the assistance of the Audit Committee:

i. he adequacy and effectiveness of the Company's system of internal controls over financial reporting, including any significant deficiencies and significant changes in internal controls;
ii. the quality and integrity of the Company's external financial reporting processes;
iii. the Company's disclosure controls and procedures, including any significant deficiencies in or material non-compliance with, such controls and procedures; and
iv. the relationship of the Audit Committee with other committees of the Board and management.

***Ethical and Legal Compliance and Risk Management***

- Reviewing and approving the Company's Code of Business Conduct and Ethics.
- Reviewing and monitoring:

i. compliance with the Code of Business Conduct and Ethics and other ethical standards adopted by the Company; and
ii. the Company's compliance with applicable legal and regulatory requirements, though notwithstanding the foregoing and subject to applicable law, nothing contained in this Mandate is intended to require the Board to ensure the Company's compliance with applicable laws or regulations.

- In conjunction with management, identifying the principal risks of the Company's business and reviewing and monitoring management's implementation of appropriate systems to seek to effectively monitor, manage and mitigate the impact of such risks.

## THE COMPANY'S CORPORATE GOVERNANCE PRINCIPLES AND GUIDELINES

111. The Company's Corporate Governance Principles and Guidelines state in relevant part:

> ***Board and Committee Mandates***
>
> The Board is responsible for the stewardship of the Company and has adopted the Board Mandate setting out the Board's responsibilities with respect to the stewardship and oversight of the Company and providing for the establishment of standing committees of the Board (which committees currently consist of the Audit Committee, the Compensation and Talent Development Committee and the Nominating, Environmental, Social and Governance Committee (the "**NESG Committee**"). The mandates of these committees are set out in their respective charters.
>
> The Board shall review and assess, or may delegate to the NESG Committee to review and assess, the adequacy of the Board and committee mandates and recommend any proposed changes to the Board for consideration.
>
> Every charter must be disclosed in accordance with the listing standards, policies and guidelines of relevant stock exchanges and securities laws, including, if applicable, the Toronto Stock Exchange and National Instrument 58-101 – *Corporate Governance Guidelines*, and made publicly available on the Company's website.
>
> ***Corporate Governance*** The Board has delegated responsibility to the NESG Committee for developing the Company's approach to corporate governance for the Board's approval, including recommending modifications to these Governance Guidelines for consideration by the Board.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

112. The Company's Audit Committee Charter states in relevant part:

> **I. PURPOSE**
>
> The Committee's purpose is to assist the Board in its oversight of:
>
> - the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
> - the independence, qualifications, appointment and performance of the Company's external auditor (the "**external auditor**");

- the Company's disclosure controls and procedures, internal control over financial reporting, and management's responsibility for assessing and reporting on the effectiveness of such controls;
- the organization and performance of the Company's internal audit function;
- the Company's compliance with applicable legal and regulatory requirements; and
- the Company's enterprise risk management processes.

**II. ACCESS TO INFORMATION AND AUTHORITY**

In carrying out its duties and responsibilities, the Committee shall have the authority to:

- communicate directly with the external auditor and to meet with and seek any information it requires from employees, officers, directors or external parties;
- review the plan and any significant reports of the internal auditors and meet with persons responsible for the internal audit function;
- investigate any matter relating to the Company's accounting, auditing, internal control or financial reporting practices or anything else within its scope of responsibility;
- take whatever actions it deems appropriate, in its sole discretion, to foster an internal culture within the Company that results in the development and maintenance of a superior level of financial reporting standards, sound business risk practices and ethical behavior;
- obtain full access to all Company books, records, facilities and personnel; and
- at its sole discretion and at the Company's expense, retain and set the compensation of outside legal, accounting or other advisors, as necessary to assist in the performance of its duties and responsibilities.

The Company will provide appropriate funding, as determined by the Committee, for compensation to the external auditor, to any advisors that the Committee chooses to engage and for payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

***

**IV. RESPONSIBILITIES AND DUTIES OF THE COMMITTEE**

In addition to such other duties as may from time to time be expressly assigned to the Committee by the Board, the Committee shall have the following responsibilities and duties:

***Financial Reporting***

- Prepare an audit committee report to be included in the Company's annual proxy circular.
- Prior to their public disclosure, review and discuss with management and, if applicable, the external auditor or the internal auditor:

  (i) the Company's annual financial statements and the related MD&A, including the discussion of critical accounting estimates under the Generally Accepted Accounting Principles ("**GAAP**") included therein and, if appropriate, recommend to the Board the approval, filing and disclosure of such information;
  (ii) the Company's annual earnings press releases, including any pro forma or non-GAAP information included therein;
  (iii) the Company's quarterly unaudited financial statements and associated MD&A, including the discussion of critical accounting estimates included therein;
  (iv) the Company's quarterly earnings press releases, including any pro forma or non-GAAP information included therein;
  (v) the type and presentation of financial information and earnings guidance provided to analysts, ratings agencies and others;
  (vi) to the extent they include financial information extracted or derived from the Company's financial statements, other public reports or filings by the Company, including the Company's annual report on Form 10-K and proxy circular;
  (vii) internal controls (or summaries thereof) and the integrity of the financial reporting and related attestations by the external auditor of the Company's internal control over financial reporting;
  (viii) any significant difficulties encountered during the course of the audit, including, but not limited to, any restrictions on the scope of work or access to required information; and
  (ix) the Company's guidelines and policies governing the process of risk assessment and risk management.

## **<u>THE COMPANY'S CODE OF BUSINESS CONDUCT AND ETHICS</u>**

113. Hut 8 maintains a Code of Business Conduct and Ethics (the "Code"). The Code states that it was "designed to promote integrity and deter wrongdoing" and that it applies to "[e]very Company director, officer, employee and other personnel that the Company may determine should be subject to this Code of Business Conduct and Ethics, such as contractors or consultants (each a 'Covered Person')[.]"

114. The Code warns Covered Persons that any violation of the code of conduct, "including fraudulent reports, may result in disciplinary action including termination of

employment for cause or termination of service and, if warranted, legal proceedings."

115. The Code contains a section titled "Standards of Good Professional Ethics," in which it states that: "[a]ll of the Company's business activities and affairs must be carried out ethically and honestly. The Company expects all Covered Persons to conduct themselves with honesty and integrity and to avoid even the appearance of improper behavior."

116. With respect to compliance with applicable laws, the Code mandates that all Covered Persons: "[a]lways follow applicable laws, rules and regulations and do not engage in any type of illegal, unethical, fraudulent or corrupt business practices for any reason. The Company expects each Covered Person to understand the legal and regulatory requirements applicable to his or her business unit and areas of responsibility." The Code goes on to specify that "Covered Persons must comply with applicable insider trading laws, which generally prohibit buying or selling securities of the Company while in possession of material non-public information about the Company."

117. In a section titled "Ensure Financial Integrity," the Code further provides:

> The Company is committed to the transparency and integrity of publicly filed financial reports and other communications. Covered Persons must do their part to ensure that the Company's public disclosure is full, fair, accurate, timely and understandable.
>
> Always act responsibly and exercise sound judgment regarding matters involving the Company's finances. Keep accurate, complete and timely records, and submit accurate and complete reports. Do not mislead, manipulate or improperly influence the Company's finance team or external auditors or make any false or misleading statements or omissions in the Company's public disclosure. Covered Persons should not personally enter into any side agreements or other informal arrangements, written or oral, related to the Company.

**<u>DUTIES OF THE DIRECTOR DEFENDANTS</u>**

118. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business

practices and policies and assuring the integrity of its financial and business records.

119. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

120. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

121. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

122. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

123. Each Director Defendant, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

124. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

125. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

126. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

127. Plaintiffs are current owners of the Company's common stock and have continuously been owners of the Company's stock during the times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

128. Because of the facts set forth herein, Plaintiffs have not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile

and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

129. At the time this suit was filed, the Company's Board was comprised of nine (9) members – including Defendants Tai, Ho, Genoot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson, and Rickertsen. At the time of filing this Consolidated Complaint, Defendant Hefti had left the Board, leaving just eight (8) directors. Thus, Plaintiffs are required to show that a majority of the Director Defendants cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

130. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

**The Director Defendants Each Face a Substantial Likelihood of Liability**

131. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

132. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith

effort to prevent or remedy that situation.

133. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

134. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

135. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

136. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false Registration Statement to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. Each of the Director Defendants either signed and/or authorized the dissemination of

Registration Statement.

137. Demand on the Board is additionally futile as each of the Director Defendants held leadership positions or were directors of Legacy Hut or USBTC prior to the Merger and thus had a personal interest in seeing the completion of the Merger. Specifically, Defendants Tai, Hefti, Flinn and Rickertsen were directors at pre-Merger Hut 8 and Defendants O'Neal, Shattuck, and Wilkinson were directors of USBTC. Both Defendants Ho and Genoot were co-founders and in leadership positions at USBTC. Given this conflict, none of the Director Defendants could be considered independent or objectively consider a demand to sue.

138. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

139. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Genoot**

140. The principal professional occupation of Defendant Genoot is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, and accordingly he is conflicted and cannot impartially consider a demand. As such, Defendant Genoot cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

141. As CEO, Defendant Genoot also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Genoot could not

objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Genoot is therefore futile. Further, the Company's proxy statement, filed with the SEC on April 28, 2026 (the "2026 Proxy Statement"), admits that Genoot is not an independent director.

142. Defendant Genoot also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein in the Registration Statement and in other public forums. Thus, as the main perpetrators of the wrongdoing alleged herein, Defendant Genoot is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

143. Defendant Genoot is not independent from Defendants Shattuck III, Rickertsen, and Wilkinson because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Genoot). The purpose of the Compensation Committee is to assist the Board in discharge of its responsibilities related to the compensation and benefits provided by the Company to its CEO and executive officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Genoot could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future. *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder*

*Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

144. In addition, Defendant Genoot co-founded USBTC with Defendant Ho, with whom he shares extensive professional and personal relationships as a result. As such, Defendant Genoot could not reasonably consider a demand to sue Defendant Ho, the individual he built a business and a strong personal and professional relationship with.

145. Because of Defendant Genoot's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Genoot is unable to comply with his fiduciary duties and prosecute this action.

**Defendant Ho**

146. The principal professional occupation of Defendant Ho is his employment with the Company as its CSO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, and accordingly he is conflicted and cannot impartially consider a demand. As such, Defendant Ho cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

147. As CSO, Defendant Ho also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Ho could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Ho is therefore futile. Further, the 2026 Proxy Statement admits that Ho is not an independent director.

148. Defendant Ho also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein in the Registration Statement and in other public forums. Thus, as the main perpetrators of the wrongdoing alleged herein, Defendant Ho is irreconcilably

conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

149. Defendant Ho is not independent from Defendants Shattuck III, Rickersten and Wilkinson because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CSO (Defendant Ho). The purpose of the Compensation Committee is to assist the Board in discharge of its responsibilities related to the compensation and benefits provided by the Company to its CSO and executive officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Ho could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future. *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

150. Further, for the period December 4, 2020 through January 5, 2021, USBTC entered into secured promissory notes with various existing investors of USBTC, including USBTC's CEO and director, Michael Ho, a family member of Defendant Ho and a family member of USBTC's President and director, Asher Genoot. Additionally, USBTC entered into secured promissory notes with Jonathan Honig, a former beneficial owner of more than 5% of the voting securities of USBTC at the time of the transaction, and an entity controlled by Jonathan Honig (collectively referred to as "Honig"), Erica Groussman, a former beneficial owner of more than 5% of the voting

securities of USBTC at the time of the transaction ("Mrs. Groussman") and an entity controlled by an immediate family member of Tara Stetson (the entity, together with Mrs. Stetson, collectively referred to as the "Stetsons"), a former beneficial owner of more than 5% of the voting securities of USBTC at the time of the transaction. The principal balances of the notes totaled approximately $5.9 million. Of the $5.9 million in notes, approximately an aggregate of $1.12 million of the notes were held by Defendant Ho and his family member, $0.1 million was held by Defendant Genoot's family member, approximately $2.4 million was held by Honig, $0.25 million was held by Mrs. Groussman and $0.25 million was held by the Stetson Entity.

151. In addition, Defendant Ho co-founded USBTC with Defendant Genoot, with whom he shares extensive professional and personal relationships as a result. As such, Defendant Ho could not reasonably consider a demand to sue Defendant Genoot, the individual he built a business and a strong personal and professional relationship with

152. Because of Defendant Ho's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Ho is unable to comply with his fiduciary duties and prosecute this action.

**Defendants Flinn, O'Neal and Shattuck**

153. Defendants Flinn, O'Neal, and Shattuck served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

154. The Individual Defendants breached their fiduciary duties of due care, loyalty, and

good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, the Individual Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Excused**

155. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

156. The Company, at all material times, had its Code and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

157. In violation of the Code, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code, the Director Defendants failed to comply

with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

158. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

159. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

160. Publicly traded companies, such as Hut 8, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

161. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

**FIRST CAUSE OF ACTION**

**(Against the Individual Defendants for Breach of Fiduciary Duties)**

162. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 29-124 above, as though fully set forth herein.

163. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

164. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

165. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending

securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against The Individual Defendants for Gross Mismanagement)**

168. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 29-124 above, as though fully set forth herein.

169. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

170. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

171. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

172. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 29-124 above, as though fully set forth herein.

173. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

174. As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

175. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against The Individual Defendants for Unjust Enrichment)**

176. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 29-96, 104-106 above, as though fully set forth herein.

177. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

178. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

179. Plaintiffs, as shareholders and representatives of the Company, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against Defendants Leverton, Visram, Ho and Genoot for Contribution Under § 11(f) of the Securities Act and 21D of the Exchange Act)**

180. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 29-103 above, as though fully set forth herein.

181. Defendants Leverton, Visram, Ho, and Genoot, along with Hut 8, along with the are defendants in the Securities Class Action, that asserts claims against Hut 8 as a joint tortfeasor for violations of Sections 11 and 15 of the Securities Act.

182. The lead plaintiff in the Securities Class Action alleges that the Company's Registration Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading. Hut 8, as the issuer of securities, is strictly liable to the lead plaintiff and putative class in the Securities Class Action under Section 11 of the Securities Act for the misstatements and misleading omissions contained therein.

183. The lead plaintiff in the Securities Class Action alleges that Leverton, Visram, Ho, and Genoot made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true, without omissions of any material facts, and not misleading. The Individual Defendants were responsible for the contents and dissemination of the Registration Statements. Due to their positions of control and authority as officers and/or directors of Hut 8, Defendants Leverton, Visram, Ho, and Genoot were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

184. Accordingly, Defendants Leverton, Visram, Ho, and Genoot are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), that creates a private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the

application of a private right of action for contribution arising out of violations of the Securities Act.

185. Hut 8 is entitled to receive all appropriate contribution or indemnification Defendants from Leverton, Visram, Ho, and Genoot

**SIXTH CAUSE OF ACTION**

**(Against Defendants Leverton and Visram for Insider Selling and Misappropriation of Information)**

186. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 25-27, 29-100 above, as though fully set forth herein.

187. At the time Defendants Leverton and Visram sold their stock as stated above, they knew of the deficiencies of the King Mountain JV and sold Hut 8 stock on the basis of such information.

188. This information about the King Mountain JV was proprietary non-public information concerning Hut 8. It was a proprietary asset belonging to Hut 8, which Defendants Leverton and Visram used for their own benefit when they sold Company stock.

189. Defendants Leverton's and Visram's sales of Hut 8 stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

190. Because the use of Hut 8's proprietary information for their own gain constitutes a breach of Leverton's and Visram's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that Defendants Leverton and Visram obtained thereby.

**SEVENTH CAUSE OF ACTION**

**(Against Defendants Leverton and Visram for Unjust Enrichment)**

191. Plaintiffs incorporate by reference and re-allege the allegations contained in ¶¶1-7, 25-27, 29-100 above, as though fully set forth herein.

192. The Leverton and Visram have been unjustly enriched by their sales of Hut 8 stock while in possession and control of material adverse non-public information. This material adverse non-public information was a proprietary asset belonging to Hut 8, which Leverton and Visram used for their own benefit at the expense of, and to the detriment of, the Company

193. Plaintiffs, as a stockholders and representatives of Hut 8, seek restitution from Defendants Leverton and Visram and seek an order from this Court disgorging all profits from their insider sales.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, waste of corporate assets, and violations of the Securities Act and/or Exchange Act;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

D. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 14, 2026.

Respectfully submitted,

**EGGNATZ | PASCUCCI**

By: /s/ Joshua H. Eggnatz
Joshua H. Eggnatz
Michael J. Pascucci
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

***Local Counsel for Plaintiffs***

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston (*pro hac vice*)
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Leal Counsel for Plaintiffs Wesley Aliko and Matthew Medney***

**THE ROSEN LAW FIRM, P.A**
Laurence M. Rosen
Erica L. Stone (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: lrosen@rosenlegal.com

Email: estone@rosenlegal.com

***Lead Counsel for Plaintiff Alexander Jiang***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of May 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Joshua H. Eggnatz*